**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 01-50476
_____

UNITED STATES OF AMERICA

Plaintiff - Appellee,

versus

REYNALDO PORTILLO-AGUIRRE

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas, Pecos Division
_____
November 1, 2002

Before REAVLEY, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Reynaldo Portillo-Aguirre appeals both his conviction of possession with intent to distribute cocaine and his sentence. He challenges the denial of his motion to suppress evidence. The issue is whether a Border Patrol agent unlawfully extended an immigration checkpoint stop of a commercial passenger bus. Concluding that the stop exceeded its permissible duration in violation of the Fourth Amendment, we reverse and remand for entry of a judgment of acquittal.

-1-

# I.  BACKGROUND

On September 20, 2000, at about 10:15 p.m., an Americanos passenger bus arrived at the Sierra Blanca immigration checkpoint.[1] Border Patrol agents followed their usual procedure for inspecting a commercial bus: the bus was directed to a secondary inspection area; one agent opened the luggage bins located along the lower exterior of the bus, allowing a second agent with a drug-detecting dog to inspect the compartments; meanwhile, a third agent, Jade Woodruff, boarded the bus.  Once aboard the bus, Agent Woodruff announced, in both English and Spanish, that he was performing an immigration inspection and asked non-United States citizens to have their documents ready.[2]  He then inspected each passenger as he made his way down the aisle to the back of the bus.  Portillo-Aguirre was sitting in the fourth window seat from the front on the driver's side of the bus.  His wife, Maria Portillo-Bringas, was in the seat directly in front of him.  At the suppression hearing, Agent Woodruff testified that Portillo-Aguirre seemed nervous from the moment the agents boarded the bus.  Portillo-Aguirre's

---

[1]  The Sierra Blanca checkpoint is permanent in nature.  It is located on Interstate Highway 10 about eighty miles southeast of El Paso, Texas; four miles west of Sierra Blanca, Texas; and fourteen air miles from the United States-Mexico border.  Recognizing the importance of Interstate 10 as an artery of domestic travel, this court has held that the Sierra Blanca checkpoint is not a border equivalent.  *See United States v. Jackson*, 825 F.2d 853, 854 (5th Cir. 1987) (en banc).

[2]  Agent Ted Barron, who initially boarded the bus with Agent Woodruff, exited shortly thereafter and did not participate in checking the immigration status of the passengers.

documents indicated, however, that he was a resident alien, and Agent Woodruff was satisfied that his presence in the United States was lawful. So Agent Woodruff continued his inspection, which included checking the bathroom at the back of the bus for illegal aliens or narcotics.

After Agent Woodruff completed his immigration inspection, and while he was returning to the front of the bus to exit, he noticed a small carry-on bag underneath Portillo-Aguirre's seat. Agent Woodruff testified that he had not seen the bag earlier because Portillo-Aguirre was sitting with his legs straight down and had a pillow and a book on his lap. In other words, the bag was visible only from behind Portillo-Aguirre's seat. Agent Woodruff further testified that Portillo-Aguirre appeared rigid and was looking straight ahead, which aroused Agent Woodruff's suspicion. Acting on this suspicion, he began to question Portillo-Aguirre.

The first question was whether Portillo-Aguirre had a bag on the bus. In response, Portillo-Aguirre pointed to a backpack located in the overhead bin above his seat. Agent Woodruff then asked Portillo-Aguirre if the bag beneath his seat belonged to him, and Portillo-Aguirre indicated that it did. Agent Woodruff next inquired about the contents of the bag, and, according to his testimony, Portillo-Aguirre began to fidget nervously and replied that the bag contained books and clothes. When Agent Woodruff asked if he could look inside the bag, Portillo-Aguirre responded by placing the bag in the empty aisle seat next to him and opening

-3-

it. Portillo-Aguirre attempted to show that the bag contained only books and clothes, but Agent Woodruff perceived that something was concealed in the bottom of the bag. Agent Woodruff therefore requested permission to search the bag himself, and Portillo-Aguirre consented. Agent Woodruff moved aside the top objects in the bag and discovered a brown tape-wrapped bundle that he recognized as being consistent with narcotics packaging. As a result of this discovery, Agent Woodruff arrested Portillo-Aguirre and called for Agent Barron to remove Portillo-Aguirre from the bus. When Agent Barron came aboard, Agent Woodruff informed his colleague that he had seized marijuana or cocaine. As Agent Barron was escorting him off the bus, Portillo-Aguirre turned and said, "It's cocaine."

After the arrest, Agent Woodruff noticed another bag under the seat in front of the one where Portillo-Aguirre had sat. Although different in color, the bag was identical in design to the one seized from Portillo-Aguirre. Agent Woodruff questioned the passengers and discovered that the bag belonged to Portillo-Aguirre's wife. She consented to a search, and Agent Woodruff found another wrapped bundle. He then placed her under arrest and escorted her off the bus.[3] According to Agent Woodruff, the entire stop lasted about ten minutes.

---

[3] Both bundles contained cocaine. A grand jury charged both Portillo-Aguirre and his wife with possession with intent to distribute cocaine, but the government later dropped the charges against her.

The district court denied Portillo-Aguirre's and his wife's motions to suppress the evidence obtained on the bus, holding that the seizure of the bus at the checkpoint was constitutionally permissible and that the Border Patrol has the authority to extend an immigration seizure to investigate whether illegal drugs are on board a vehicle if the agent is aware of specific articulable facts that reasonably warrant suspicion. The court found that there was reasonable suspicion to support the continued seizure of Portillo-Aguirre and his fellow passengers based on the following facts: Portillo-Aguirre was nervous; the bag under his seat could be seen only from behind; when asked about his luggage, Portillo-Aguirre initially pointed to his backpack in the overhead compartment; and he became increasingly nervous as the questioning progressed. Finally, the court held that Portillo-Aguirre voluntarily consented to the search of his bag.

A jury convicted Portillo-Aguirre of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).[4] He now appeals his conviction and argues that the district court should have granted his motion to suppress.

---

[4] Portillo-Aguirre stipulated at trial that the substance seized from him was cocaine and that, with packaging, the cocaine weighed 17.19 kilograms. Without packaging, the cocaine weighed 12.99 kilograms. Based on the presentence report, which erroneously listed the net weight of the cocaine at 17.19 kilograms instead of 12.99 kilograms, the trial judge sentenced Portillo-Aguirre to 151 months' imprisonment and five years of supervised release. Portillo-Aguirre appeals his sentence and contends that the drug-quantity error increased his base offense level from 32 to 34. Because we reverse his conviction, we do not reach this issue.

## II. ANALYSIS

### A. Standard of Review

In an appeal from the denial of a motion to suppress, we review questions of law *de novo* and the district court's factual findings for clear error.[5] "To the extent the underlying facts are undisputed, as they essentially are here, we may resolve questions such as probable cause and reasonable suspicion as questions of law."[6]

### B. Seizure of the Bus

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[7] "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."[8] When law enforcement officers stop a vehicle at a highway checkpoint, a seizure within the meaning of the Fourth Amendment has occurred.[9] In *United States v. Martinez-Fuerte*, however, the Supreme Court upheld the constitutionality of permanent immigration checkpoints at which

---

[5] *United States v. Burbridge*, 252 F.3d 775, 777 (5th Cir. 2001).

[6] *Blackwell v. Barton*, 34 F.3d 298, 305 (5th Cir. 1994). *Accord United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999).

[7] U.S. CONST. amend. IV.

[8] *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).

[9] *See id.* at 40; *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976).

travelers were stopped and briefly questioned about their immigration status without individualized suspicion.[10] Although not supported by reasonable suspicion, the Court considered the programmatic purpose of the stops—interdicting the flow of illegal aliens—to be sufficient justification for checkpoint seizures.[11] Balancing the government's interest in enforcing its immigration policy against the rights of those lawfully present in the United States, the Court found that "[w]hile the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited."[12] The Court further stated that the principal protection of Fourth Amendment interests at checkpoints "lies in appropriate limitations on the scope of the stop."[13] Thus, any further detention beyond a brief question or two or a request for documents evidencing a right to be in the United States must be based on consent or probable cause.[14]

Passengers traveling on a commercial bus receive the same degree of constitutional protection and are subject to the same legitimate intrusions on their Fourth Amendment interests as those

---

[10] *See* 428 U.S. at 566–67.

[11] *See Edmond,* 531 U.S. at 37–39.

[12] *Martinez-Fuerte*, 428 U.S. at 557.

[13] *Id.* at 567.

[14] *See id.* at 558, 567 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)).

in private vehicles.[15]  Accordingly, immigration officers may detain a busload of passengers at a permanent checkpoint and conduct an immigration inspection without violating the passengers' Fourth Amendment right to be free from unreasonable seizures.[16]  We therefore agree with the district court that the initial seizure of Portillo-Aguirre and his fellow passengers on the Americanos bus was constitutionally permissible.

## C.  Extension of the Seizure

Although the Supreme Court created a narrow exception to the general requirements of reasonable suspicion and probable cause in *Martinez-Fuerte*, it emphasized that appropriate limitations on the scope of an immigration stop safeguard Fourth Amendment rights at permanent checkpoints.[17]  In *United States v. Machuca-Barrera,* we addressed those limitations in detail and noted that "[t]he scope of an immigration checkpoint stop is limited to the justifying, programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint."[18]  It follows that the permissible duration of an immigration stop is the "time

_____

[15] *See Florida v. Bostick*, 501 U.S. 429, 438 (1991).

[16] *See Men Keng Chang v. Jiugni*, 669 F.2d 275, 279 (5th Cir. 1982) (recognizing that the stop of a bus at a permanent immigration checkpoint is permissible even without reasonable suspicion of wrongdoing).

[17] *See Martinez-Fuerte*, 428 U.S. at 566–67.

[18] 261 F.3d 425, 433 (5th Cir. 2001).  The district court did not have the benefit of our opinion in *Machuca-Barrera* when it denied Portillo-Aguirre's motion to suppress.

-8-

reasonably necessary to determine the citizenship status of the persons stopped."[19]  In this case, Agent Woodruff testified that he had determined the citizenship status of the bus passengers *before* he began to question Portillo-Aguirre about the bag underneath his seat.  Consequently, the issue is whether Agent Woodruff unlawfully extended the stop beyond its permissible duration.  Our cases provide significant guidance on this issue.

In *Machuca-Barrera*, we considered the stop of an automobile at a permanent immigration checkpoint.  While questioning the driver and his passenger about their citizenship, a Border Patrol agent asked whether they were carrying any firearms or drugs.[20]  After they answered in the negative, the agent asked for and received consent to search the car.[21]  Agents discovered a large stash of marijuana in the car's trunk.[22]  On appeal from the denial of his motion to suppress, Machuca-Barrera claimed that the agent's inquiry about drugs violated the Fourth Amendment because it was not based on reasonable suspicion.[23]

In our analysis, we stated that the Constitution is violated when a detention extends beyond the valid reason for the initial

---

[19]  *Id.*

[20]  *Id.* at 429-30.

[21]  *Id.* at 430.

[22]  *Id.*

[23]  *Id.*

stop.[24]  "An officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop."[25]  Thus, we declined to second-guess the questions a law enforcement officer chooses to ask and focused instead on policing the duration of the stop.[26]  A stop may not exceed its permissible duration unless the officer has reasonable suspicion of criminal activity:

> Of course, a Border Patrol agent may extend a stop based upon sufficient individualized suspicion.  For extended detentions or for searches, *Martinez-Fuerte* requires consent or probable cause.  Also, if the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification.  Thus, an agent at an immigration stop may investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial, lawful stop creates reasonable suspicion warranting further investigation.[27]

The stop of Machuca-Barrera lasted only a couple of minutes.[28]  We found that this was within the permissible duration of an immigration checkpoint stop.[29]  And we concluded that the Border Patrol agent's single question about drugs during the course of the immigration inspection did not unlawfully extend the stop: "The

---

[24] *Id.* at 432.

[25] *Id.*

[26] *See id.* at 433–34.

[27] *Id.* at 434.

[28] *Id.* at 435.

[29] *Id.*

-10-

brief stop by Agent Holt, which determined the citizenship status of the travelers and lasted no more than a couple of minutes before Agent Holt requested and received consent to search, was constitutional."[30]

Conversely, when officers detain travelers after the legitimate justification for a stop has ended, the continued detention is unreasonable. We have found that police violated the Fourth Amendment by extending a stop even three minutes beyond its permissible duration.

In *United States v. Jones*, officers stopped a car for a speeding violation.[31] The initial detention lasted about fifteen minutes; during that period, the officers ran background checks and questioned the driver and his passenger about their rental car.[32] But after the police dispatcher informed the officers that neither traveler had a criminal history and that their drivers' licenses were valid, the officers continued to detain them and eventually obtained their consent to search the car, which contained narcotics.[33] This court reversed their convictions, holding that the officers' failure to release the defendants after discovering that they had clean records violated the Fourth Amendment:

---

[30] *Id.*

[31] 234 F.3d 234, 237 (5th Cir. 2000).

[32] *Id.* at 237–39.

[33] *Id.* at 238–39.

-11-

The basis for the stop was essentially completed when the dispatcher notified the officers about the defendants' clean records, three minutes before the officers sought consent to search the vehicle. Accordingly, the officers should have ended the detention and allowed the defendants to leave. And the failure to release the defendants violated the Fourth Amendment.[34]

Similarly, in *United States v. Dortch*, highway patrol officers stopped the defendant's car for traveling too close to another vehicle.[35] Because the rental papers for the car Dortch was driving did not list him as an authorized driver, the officers ran a computer check on his license and the rental papers.[36] After the computer check turned up no reason to hold Dortch, the officers nevertheless continued to detain him until a canine unit arrived nearly five minutes later.[37] With the help of the canine unit, the officers eventually discovered that Dortch was concealing cocaine underneath his clothing. We found, however, that Dortch should have been free to leave when the computer check came back negative.[38] "Once he was not permitted to drive away, the extended detention became an unreasonable seizure . . . ."[39] Since there was

---

[34] *Id.* at 241.

[35] 199 F.3d 193, 195 (5th Cir. 1999).

[36] *Id.* at 195–96. The law enforcement purposes to be served by the computer check were to ensure that there were no outstanding warrants on Dortch and that the vehicle had not been stolen. *Id.* at 199.

[37] *Id.* at 196.

[38] *Id.* at 199.

[39] *Id.*

no reasonable or articulable suspicion that Dortch was trafficking in narcotics at the time the computer check was completed, we reversed his conviction.[40]

With these authorities in mind, we return our focus to the continued detention of Portillo-Aguirre after the immigration check was completed. At the suppression hearing, Agent Woodruff testified that his *modus operandi* for bus inspections in September 2000 was to verify the passengers' citizenship status and then begin looking for signs of narcotics trafficking. Because he proceeded in this manner on the day he arrested Portillo-Aguirre, we must first decide whether Agent Woodruff's general method passes constitutional muster. We find that it does not.

The Supreme Court has upheld brief, suspicionless seizures of motorists at checkpoints created to intercept illegal aliens[41] or remove drunk drivers from the road.[42] When the primary purpose of a checkpoint is to intercept illegal narcotics, however, the Supreme Court has held that the checkpoint violates the Fourth Amendment.[43] The Court reached this conclusion in *City of Indianapolis v. Edmond*, where it pronounced: "We have never approved a checkpoint program whose primary purpose was to detect

---

[40] *Id.* at 199, 203.

[41] *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).

[42] *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990).

[43] *See City of Indianapolis v. Edmond*, 531 U.S. 32, 47–48 (2000).

-13-

evidence of ordinary criminal wrongdoing."[44]   The government's interest in intercepting illegal drugs, the Court held, was indistinguishable from the government's interest in "ordinary crime control."[45]   Thus, as we recognized in *Machuca-Barrera*, "checkpoints with the primary purpose of identifying illegal immigrants are constitutional, and checkpoints with the primary purpose of interdicting illegal drugs are not."[46]   We have no doubt that the primary purpose of the Sierra Blanca checkpoint is to investigate immigration status.   The fact that an initial stop at the checkpoint is constitutional, however, does not leave us free to ignore the unconstitutionality of suspicionless detentions designed to intercept drug traffickers.   Agent Woodruff's method is essentially an attempt to circumvent the Court's holding in *Edmond* by broadening the scope of an otherwise lawful immigration seizure to include drug interdiction activity.   But when the purpose of a stop switches from enforcement of immigration laws to drug interdiction, a Fourth Amendment violation occurs unless the Border Patrol agent has individualized suspicion of wrongdoing.   Again, "[t]he key is the rule that a[n immigration] stop may not exceed its permissible duration unless the officer has reasonable

---

[44] *Id.* at 41.

[45] *Id.* at 44.

[46] 261 F.3d at 431.

-14-

suspicion."[47]

It bears repeating that the permissible duration of an immigration stop is the time reasonably necessary to determine the citizenship status of the persons stopped.[48] Here, the stop unquestionably exceeded this permissible duration. Agent Woodruff testified that an immigration inspection of a passenger bus normally lasts three to five minutes, and he was confident that the inspection in this case fell within that range because the bus was not full. After determining the passengers' citizenship status, however, Agent Woodruff extended the stop for an additional three to five minutes in order to investigate whether Portillo-Aguirre was carrying illegal drugs. Thus, unlike in *Machuca-Barrera*, where the Border Patrol agent inquired about drugs during the course of the immigration inspection, Agent Woodruff had completed his inspection before he turned his attention to drug interdiction. And his testimony at the suppression hearing does not establish that the initial, routine questioning of the passengers for immigration purposes generated reasonable suspicion of criminal activity. Although Agent Woodruff stated that Portillo-Aguirre seemed nervous from the moment the agents boarded the bus, this "generic claim of nervousness" does not justify the extension of

----

[47] *Id.* at 434.

[48] *See id.* at 433.

the stop.[49]

Because Agent Woodruff did not develop reasonable suspicion during his initial, lawful encounter with Portillo-Aguirre, our final inquiry is whether he developed the requisite suspicion while returning to the front of the bus to exit. This inquiry hinges on the two articulated facts known to Agent Woodruff before he extended the detention by questioning Portillo-Aguirre about his luggage: (1) there was a bag underneath Portillo-Aguirre's seat that Agent Woodruff did not notice during the immigration inspection because of the manner in which Portillo-Aguirre was sitting, and (2) Portillo-Aguirre appeared rigid and was looking

---

[49] *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997). We have never held that nervousness alone is sufficient to create reasonable suspicion of criminal activity. In fact, we often give little or no weight to an officer's conclusional statement that a suspect appeared nervous. *See, e.g., Dortch*, 199 F.3d at 199; *United States v. Samaguey*, 180 F.3d 195, 198–99 (5th Cir. 1999). Other circuits have explicitly held that nervousness alone does not justify detention beyond the permissible duration of a stop. *See United States v. Chavez-Valenzuela,* 268 F.3d 719, 726 (9th Cir. 2001) ("We . . . hold today that nervousness during a traffic stop—even the extreme nervousness Chavez-Valenzuela exhibited here—in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity, and does not justify an officer's continued detention of a suspect after he has satisfied the purpose of the stop."); *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) ("Nervousness alone cannot support reasonable suspicion of criminal activity. This is because it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.") (internal quotation and citations omitted); *see also United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Although there are a plethora of cases referring to a defendant appearing nervous, nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself.").

straight ahead.[50]

First, the fact that the manner in which Portillo-Aguirre was sitting obscured the view of his bag does not support a finding of reasonable suspicion. Agent Woodruff acknowledged that it was perfectly normal for luggage to be obscured by people's legs:

> [A]s you're walking off the bus, you're facing everyone's back. So, I'm looking beneath the seats as I'm walking off because there's things you can't see stored beneath the seats from the front because people's legs are in the way . . . or . . . the particular piece of luggage is pushed far back where you can't see that as you're walking down the bus.

And during cross-examination by Portillo-Aguirre's counsel Ray Velarde, Agent Woodruff also admitted that there was nothing inherently suspicious about the bag underneath Portillo-Aguirre's seat:

> VELARDE: Now, there was nothing apparent about the bag upon visual inspection that aroused your suspicion. Correct?
>
> WOODRUFF: Other than — no.
>
> VELARDE: Nothing[?]
>
> WOODRUFF: From where I stood, no.
>
> VELARDE: It's just a plain and ordinary bag.
>
> WOODRUFF: It's a bag that's not visible from the front.
>
> VELARDE: And this bag is not commonly used . . . by

---

[50] The additional facts credited by the district court in finding that Agent Woodruff had reasonable suspicion, *i.e.*, that Portillo-Aguirre initially admitted ownership of the backpack in the overhead compartment alone and became increasingly nervous as the questioning progressed, did not surface until after the detention had been unlawfully extended. Consequently, they are irrelevant to our inquiry.

> dope smugglers?

WOODRUFF: Not that I'm aware of.

VELARDE:  That didn't come into the picture?

WOODRUFF: No.

In short, neither the bag nor its location suggested that criminal activity was afoot.  If such common circumstances qualified as reasonable suspicion, then most interstate travelers would be subject to prolonged detention, for virtually any item of luggage, from a handbag to a suitcase, is capable of housing illegal narcotics.

Second, Agent Woodruff's additional observation that Portillo-Aguirre was sitting in an erect and rigid fashion and looking straight ahead does not tip the scales in favor of reasonable suspicion.  Because consistency between a bus passenger's posture and the design of his seat is hardly suspicious, this fact can be given little or no weight.  Considering, then, the totality of the circumstances, including the Border Patrol agent's constitutionally defective *modus operandi*, we conclude that Portillo-Aguirre's nervous appearance, the position of his luggage, and his erect posture did not amount to reasonable suspicion of drug trafficking or any other crime.

In *Machuca-Barrera*, we observed limitations on the use of immigration checkpoints to stop and question people regarding their citizenship status without individualized suspicion of wrongdoing.  Although we do not require Border Patrol agents to look the other

-18-

way when evidence of criminal activity is before them, if an agent does not develop reasonable suspicion of such activity before the justifying purpose of a checkpoint stop has been accomplished, he may not prolong the stop. Agent Woodruff did not develop reasonable suspicion of criminal activity while he was questioning the passengers on the Americanos bus about their citizenship status. So, unless something occurred while Agent Woodruff was returning to the front of the bus that raised reasonable suspicion of criminal activity, thereby justifying his extension of the stop, Portillo-Aguirre and his fellow passengers, like the motorists in *Jones* and *Dortch*, should have been permitted to leave.[51] As we have explained, no such thing happened here. We therefore hold that the extended detention became an unreasonable seizure in violation of the Fourth Amendment.[52]

---

[51] *See Jones*, 234 F.3d at 241; *Dortch*, 199 F.3d at 199.

[52] Contrary to our dissenting colleague's opinion, *United States v. Drayton*, 122 S.Ct. 2105 (2002), is fundamentally distinguishable from the present case and therefore does not govern our decision. In *Drayton*, the passengers who consented to searches by plainclothes police officers *were not seized* because the requests for consent were made under circumstances in which a reasonable person would feel free to refuse or otherwise terminate the encounter: the passengers were on a Greyhound bus temporarily parked at an ordinary bus terminal; the driver had left the bus to complete paperwork inside the terminal building; passengers who declined to cooperate or who chose to exit the bus at any time would have been allowed to do so without argument; and it was common for passengers to leave the bus for a cigarette or a snack while the officers were on board. *See id.* at 2109–10, 2112.
     In the present case, however, there is no dispute that Portillo-Aguirre and his fellow passengers were "seized" during the entire time that their bus was stopped at the Sierra Blanca checkpoint. *See Edmond*, 531 U.S. at 40 ("[A] vehicle stop at a

D.  Search of Portillo-Aguirre's Bag

Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.[53]  In this case, Portillo-Aguirre consented to the search of his bag. Therefore, our finding of an illegal seizure does not definitively determine whether the evidence derived from the search must be excluded.[54]  "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation."[55]

In *United States v. Chavez-Villarreal*, we noted that when we evaluate consent given after a Fourth Amendment violation, "[t]he admissibility of the challenged evidence turns on a two-pronged inquiry: whether the consent was voluntarily given and whether it

---

highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment."); *Martinez-Fuerte*, 428 U.S. at 556 ("[C]heckpoint stops are 'seizures' within the meaning of the Fourth Amendment.").  Thus, this case presents a very different question from the one raised in *Drayton*.  Our concern is not with whether Portillo-Aguirre was seized, for he unquestionably was. Instead, the question here is whether the seizure of Portillo-Aguirre, his fellow passengers, and their bus extended beyond its permissible duration in violation of the Fourth Amendment.  For the reasons we have given, we conclude that it did.

[53] *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998). Thus, "[t]he burden of showing admissibility rests on the government."  *United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993).

[54] *See Chavez-Villarreal*, 3 F.3d at 127.

[55] *Id.*

was an independent act of free will."[56] "Voluntariness focuses on coercion, and the second prong considers the causal connection between the 'consent' and the prior constitutional violation."[57]

Six factors bear on the voluntariness of the consent:

(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. Although all six factors are relevant, no single factor is dispositive.[58]

The district court considered these factors and found that Portillo-Aguirre voluntarily consented to Agent Woodruff's search of his bag. Because this finding is entitled to great deference under the clearly erroneous standard of review, we pretermit our inquiry into voluntariness, as it is clear that the government failed to prove that Portillo-Aguirre's consent was an independent act of free will.[59] "Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will."[60]

To determine whether the consent was an independent act of

---

[56] *Id.*

[57] *Dortch*, 199 F.3d at 201.

[58] *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993) (internal quotation and citation omitted).

[59] *See Chavez-Villarreal*, 3 F.3d at 128; *Dortch*, 199 F.3d at 201–02; *Jones*, 234 F.3d at 243.

[60] *Chavez-Villarreal*, 3 F.3d at 127–28.

free will and, thus, broke the causal chain between the consent and the illegal detention, we must consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.[61] First, Agent Woodruff's testimony establishes a close temporal proximity between the illegal conduct—the extended detention—and the consent. Indeed, the illegal detention continued until Portillo-Aguirre gave his consent, which came less than five minutes after Agent Woodruff began questioning him about his luggage.[62] Second, "no circumstances intervened between the detention and the consent, and there is no reason to think that [Portillo-Aguirre] believed he was free to go during that time."[63] Finally, we have determined that Agent Woodruff executed bus inspections in a manner inconsistent with the passengers' Fourth Amendment protection from unreasonable seizures. Because the purpose of the extended detention was to "detect evidence of ordinary criminal wrongdoing,"[64] and was not supported by reasonable suspicion, we find that "only suppression will serve the deterrence

---

[61] *Jones*, 234 F.3d at 243; *Chavez-Villarreal*, 3 F.3d at 128.

[62] *See Jones*, 234 F.3d at 243 (finding a close temporal proximity because the detention that became prolonged and unreasonable after the computer checks were completed continued up to the time of defendant's consent); *Dortch*, 199 F.3d at 202 (same).

[63] *Dortch*, 199 F.3d at 202.

[64] *Edmond*, 531 U.S. at 41.

-22-

function of the exclusionary rule."[65]  Thus, the three factors weigh in favor of concluding that there was no consent.

In sum, even if the district court correctly found that Portillo-Aguirre voluntarily gave his consent, the consent was not valid.  Instead, because the causal chain between the illegal detention and Portillo's Aguirre's consent to the search of his bag was not broken, the search was nonconsensual.[66]  And because there was no valid consent to cure the Fourth Amendment violation, the cocaine obtained during the search should have been suppressed.[67]  Portillo-Aguirre's statement affirming that the wrapped bundle contained cocaine is likewise inadmissible as fruit of the poisonous tree.[68]  There being no other evidence sufficient to convict him of possession with intent to distribute cocaine, the district court must enter a judgment of acquittal on remand.[69]

### III.  CONCLUSION

The government has an interest in intercepting illegal drugs, but the Supreme Court has held that this interest does not justify suspicionless detentions.  And we have often recognized that "[m]otorists lawfully traveling on this nation's roadways are

---

[65] *Chavez-Villarreal*, 3 F.3d at 128.

[66] *Dortch*, 199 F.3d at 202.

[67] *See id.* at 202-03.

[68] *See Chavez-Villarreal*, 3 F.3d at 126, 128.

[69] *See Dortch*, 199 F.3d at 203.

clothed with Fourth Amendment protection from arbitrary government interference."[70]  An individual's decision to travel by bus does not weaken this protection.[71]  If we were to find that the mere presence of luggage in a vehicle stopped on an interstate highway constitutes reasonable suspicion of criminal wrongdoing and therefore justifies detention beyond the valid reason for the initial stop, we would be ignoring the simple reality that intrastate and interstate travelers carry luggage.[72]  Our holding today reaffirms that those travelers are entitled to arrive at their destinations free from arbitrary government interference.

Portillo-Aguirre's conviction is REVERSED, and the case is REMANDED for entry of a judgment of acquittal.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

---

[70] *United States v. Jackson*, 825 F.2d 853, 858-59 (5th Cir. 1987) (en banc).

[71] *See Florida v. Bostick*, 501 U.S. 429, 438 (1991).

[72] In the words of our sister circuit, "[t]o sanction a finding that the Fourth Amendment permits [extended detention] based on such a weak foundation would be tantamount to subjecting the traveling public to virtually random seizures, inquisitions to obtain information which could then be used to suggest reasonable suspicion, and arbitrary exercises of police power." *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997).

-24-

REAVLEY, Circuit Judge, dissenting:

I respectfully dissent.  I can find no unreasonableness or fault in the conduct of the officers.  And I do not believe that the majority gives due deference to the district court who heard the relevant live testimony.  Nor do I believe that the majority properly applies the deferential reasonable suspicion standard.  Reasonable suspicion is a considerably less stringent standard than probable cause.  See United States v. Wangler, 987 F.2d 228, 230 (5th Cir. 1993).

To begin, absent any show of coercion or extended retention, the officers were free to ask the passengers questions on the way to leaving the bus.  The Supreme Court said in United States v. Drayton that, even with no basis for suspecting criminal activities, officers were free to "pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means."  122 S. Ct. 2105, 2110 (2002).

Furthermore, the officer's brief pause was justified by the circumstances.  Portillo-Aguirre's nervousness plus his posture that concealed the bag so it could only be seen from behind, together with the notorious history of the Sierra

Blanca checkpoint, provided sufficient reasonable suspicion for Agent Woodruff to briefly extend the stop to ask Portillo-Aguirre whether he had a bag. Woodruff testified that drug seizures on the buses stopped at the checkpoint were almost a daily event.

When Portillo-Aguirre pointed only to the backpack in the overhead bin, Woodruff had all the more reasonable suspicion to inquire about the bag beneath Portillo-Aguirre's seat. In my view Woodruff won additional time to extend the detention when Portillo-Aguirre began to fidget nervously and unsuccessfully shuffled the contents on the top of the bag to persuade Woodruff that no contraband was hidden beneath. I would hold that throughout this chain of events, which in total lasted only a few minutes, the detention did not lapse into the realm of an unreasonable seizure in violation of the Fourth Amendment.