# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-51114

United States Court of Appeals
Fifth Circuit

**FILED**

February 26, 2015

Lyle W. Cayce
Clerk

RICHARD RYNEARSON,

Plaintiff - Appellant

v.

UNITED STATES OF AMERICA; AGENT LANDS, Border Patrol Agent, Individually; RAUL PEREZ, Border Patrol Agent, Individually,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:12-CV-24

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Richard Rynearson brought this *Bivens* action against two border patrol agents in their individual capacities. He alleged they violated his Fourth Amendment rights by unlawfully detaining him. The district court granted summary judgment for the agents after concluding that they were entitled to qualified immunity. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-51114

## FACTUAL AND PROCEDURAL BACKGROUND

Rynearson, a major in the United States Air Force, was stopped at a fixed interior immigration checkpoint in Uvalde County, Texas approximately 67 miles from the United States-Mexico border in March 2010. He alleges that he has had several unpleasant experiences in prior stops at the checkpoint. Consequently, he was prepared with numerous cameras in his vehicle to record this stop. The following facts come from the pleadings and a video Rynearson recorded during the stop and posted on at least two websites. The defendants included the video as an exhibit in their Motion to Dismiss.

When Rynearson entered the checkpoint he was asked if he owned his vehicle. Upon saying he did, he was asked to move to the secondary inspection area. He was not asked about his citizenship at any point during the initial stop. Rynearson kept his window almost completely closed throughout all communications with the officers despite being repeatedly asked to open it further or step out of the vehicle. Rynearson was held in his vehicle in the secondary inspection area for a little over a minute before he was asked to display his identification. Inside the car, he stuck his driver's license and military identification between the window glass and the door's weather stripping, where they could be read from the outside of the vehicle.

Upon seeing Rynearson's military identification, Agent Lands asked him where he was stationed. The agent then asked him to step out of the car. Rynearson refused and demanded to be told why he was being detained. Agent Lands explained that he needed to determine Rynearson's citizenship and that he would be free to go afterwards, but Rynearson still refused to step out of the car or roll down his window. Rynearson insisted that he would not get out unless Lands explained his reasonable suspicions for detaining him. This discussion continued for about eight minutes before Agent Lands said he was

2

No. 13-51114

going to find a supervisor. Rynearson then added his passports to the display of documents on his window.

After Rynearson had waited 18 minutes at the checkpoint, Supervisory Border Patrol Agent Perez arrived. Rynearson explained to Agent Perez that the agents had not allowed him to leave despite the fact that he had offered his identification and told them that he was a citizen. Rynearson still refused to roll down his window or exit the vehicle. Agent Perez asked for Rynearson's passports and for the name of Rynearson's commanding officer. Rynearson refused to give the name and complained that Agent Perez was trying to interfere with his employment. Agent Perez then took Rynearson's passports into the checkpoint station and returned 13 minutes later to inform Rynearson that he was free to go. He explained that if Rynearson would be more cooperative in the future by rolling down his window to help agents hear over the traffic and by physically producing immigration documents for validation, the checkpoint procedure would be quicker. Rynearson's total time at the checkpoint was approximately 34 minutes.

Rynearson submitted an administrative claim to United States Customs and Border Protection pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., seeking $500,000 in damages as a result of the stop. His claim was denied. He then filed this suit in the United States District Court for the Western District of Texas. His FTCA claims were based on negligence, false arrest and imprisonment, intentional infliction of emotional distress, and violation of rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. His complaint also included *Bivens* claims against Agents Lands and Perez for violation of his Fourth Amendment rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

3

No. 13-51114

Only the *Bivens* Fourth Amendment claims are before this court.  All others were dismissed and no appeal was taken.

The district court concluded that Agents Lands and Perez were entitled to qualified immunity because Rynearson failed to demonstrate a violation of his Fourth Amendment rights in either the manner of conduct at the stop or the duration of the stop.  The court also found that the agents had reasonable suspicion to detain Rynearson.  Finally, the district court denied Rynearson's motion to stay summary judgment pending discovery.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment on the basis of qualified immunity.  *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).  "The doctrine of qualified immunity protects governmental officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The plaintiff has the burden of refuting a properly raised qualified immunity defense "by establishing that the official's allegedly wrongful conduct violated clearly established law." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (quotations and citation omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quotations and citations omitted).

We conduct a two-step analysis to determine whether an agent is entitled to qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194 (2001).  The usual approach is to determine, first, "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the

4

plaintiff's constitutional rights." *Freeman*, 438 F.3d at 410. If such a violation occurred, we then "consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* at 411. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Although the existence of the right is often considered first, it is permissible to begin with the determination of whether the claimed right was clearly established: "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242.

A routine interior immigration checkpoint stop conducted without reasonable suspicion does not violate the Fourth Amendment. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561-62 (1976). Border patrol agents at interior checkpoints may stop a vehicle, refer it to a secondary inspection area, request production of documents from the vehicle's occupants, and question the occupants about their citizenship. *Id.* at 562-63. The purpose of the stop is limited to ascertaining the occupants' citizenship status. *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001). "The permissible duration of an immigrant checkpoint stop is therefore the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.* "Conversely, when officers detain travelers after the legitimate justification for a stop has ended, the continued detention is unreasonable." *United States v. Portillo-Aguirre*, 311 F.3d 647, 654 (5th Cir. 2002).

Rynearson argues the agents violated his Fourth Amendment rights by being "intentionally dilatory" in waiting too long to ask about his citizenship, intentionally extending the duration of his detainment, and calling his military

base to inquire into his military status.  He argues that he had a right to refuse to cooperate because the Fourth Amendment "does not impose obligations on the citizen" to cooperate.  *See Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 187 (2004).

Rynearson relies on precedent discussing the Supreme Court's analysis in *Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry* allows a law enforcement officer to detain a person for a brief investigation if the officer can identify specific and articulable facts leading to a reasonable suspicion that the person is committing or about to commit a crime.  *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014).  In contrast, the Supreme Court has granted agents at immigration checkpoints the right to stop and question a vehicle's occupants regarding their citizenship without reasonable suspicion of any wrongdoing. *Machuca-Barrera*, 261 F.3d at 433.  That grant of authority is readily distinguishable from the authority granted by *Terry*.

There is no dispute that the initial stop was constitutional.  Neither Rynearson nor his car was searched.  Because the Supreme Court has granted agents the authority to stop, question, and inspect documents at interior checkpoints, the government argues there must also be a requirement that the individual cooperate with the agents.  The Supreme Court has concluded that "all that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975) (quotations and citation omitted).

The facts indicate that Rynearson generally asserted his right against unlawful searches and seizures while the agents had difficulty determining how to respond to his unorthodox tactics.  We have not discovered nor been shown any authority supporting Rynearson's claim that the constitutional

No. 13-51114

rights he chose to stand on were clearly established. Accordingly, we conclude that these governmental officials, at worst, made reasonable but mistaken judgments when presented with an unusually uncooperative person, unusual at least in the facts described in any of the caselaw.

Because we hold that no constitutional right of which all reasonable officers would have known was violated, we need not consider whether Rynearson actually had some limited Fourth Amendment right to refuse to cooperate. *See Pearson*, 555 U.S. at 242.

We close by examining Rynearson's argument that the district court erred by denying his motion to stay summary judgment pending limited discovery. "We review a decision to stay discovery pending resolution of a dispositive motion for an abuse of discretion." *Brazos Valley Coal. for Life, Inc. v. City of Bryan, Tex.*, 421 F.3d 314, 327 (5th Cir. 2005). We find no basis to disturb the district court's exercise of discretion. Qualified immunity "is intended to give government officials a right not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery . . . ." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (citation and internal quotations omitted). To stay summary judgment in order to allow discovery, the court must determine "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994 (5th Cir. 1995). Then, if the court remains "unable to rule on the immunity defense without further clarification of the facts," it may issue a discovery order "narrowly tailored to uncover only those facts needed to rule on the immunity claim . . . ." *Lion Boulos v. Wilson*, 834 F.2d 504, 507-08 (5th Cir. 1987). We have already discussed why the

7

No. 13-51114

officers were entitled to qualified immunity in the absence of any clearly established constitutional right. Discovery was unnecessary.

AFFIRMED.

No. 13-51114

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

At a fixed interior immigration checkpoint approximately sixty-seven miles from the United States–Mexico border, United States Air Force officer Richard Rynearson presented four forms of government-issued identification—including official and personal U.S. passports—to show that he is a United States citizen. Yet Agent Lands refused to examine the passports and Agent Perez, rather than simply scrutinizing the passports, asked Rynearson to identify his commanding officer and then made Rynearson wait while he placed phone calls to Rynearson's employer. Because the law is clearly established that immigration officials violate the Fourth Amendment when they continue to detain a traveler beyond the time reasonably necessary to investigate his citizenship status, I respectfully dissent.

## I.

The majority opinion accurately recites many of the facts that gave rise to this controversy, but I write to emphasize a couple of points. First, for the duration of the stop, Rynearson asserted his rights while also providing the documentation needed to prove his citizenship status. The majority opinion labels these actions "tactics" and calls them "unorthodox" and "unusually uncooperative." However, as the majority opinion recognizes—and a review of the record and the video confirms[1]—Rynearson began cooperating as early as

---

[1] As the majority opinion observes, Rynearson posted a video of the incident on the internet, and the defendants attached it as an exhibit to their motion to dismiss. The video, which is divided into four parts and entitled "Full Video – Border Patrol Incident," appears at the following links:

Part One:  https://www.youtube.com/watch?v=4BId1f8WG2s
Part Two:  https://www.youtube.com/watch?v=NqU9M9RyeZA
Part Three:  https://www.youtube.com/watch?v=o8GDNFleCI8
Part Four:  https://www.youtube.com/watch?v=mZbCCBH7YM4

two minutes into the stop by producing identification documents.[2]  Moreover, while he provided the information needed to prove his citizenship, Rynearson explained several times that he would not indulge the officers' commands when he thought that they exceeded the limited scope of the immigration checkpoint inquiry.  Standing on one's rights is not an "unorthodox tactic[]."  It is a venerable American tradition.

Second, the record also shows that Agents Lands and Perez did not expeditiously investigate Rynearson's citizenship status.  Approximately two minutes into the stop, Rynearson displayed his military identification and driver's license for Agent Lands, but Agent Lands waited until approximately eleven minutes into the detention to inform Rynearson that those identification cards "don't mean anything."  At that point, Rynearson immediately offered to show Agent Lands his official and personal U.S. passports.  Agent Lands ignored the offer and, for the first time, finally asked Rynearson whether he was a United States citizen.  Rynearson responded affirmatively, but he was not then permitted to leave, and Agent Lands never asked to see Rynearson's passports.

Almost eighteen minutes into the detention, Agent Perez arrived and asked for Rynearson's passports.  Rynearson instantly surrendered them. Rather than simply examine the passports, however, Agent Perez asked Rynearson to identify his commanding officer and attempted to call the Provost Marshal[3] and CID.[4]  Agent Perez spent ten to fifteen minutes on these phone calls, and Agent Lands did not inform Rynearson that he was free to leave until

---

[2] Because the parties agree that Rynearson's video is accurate, we must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

[3] The Provost Marshal is the officer in charge of the military police.

[4] "CID" refers to the U.S. Army Criminal Investigation Command.

No. 13-51114

more than fifteen minutes after Agent Perez took his passports.[5]   In total, approximately twenty-three minutes transpired between the time that Rynearson offered his passports to Agent Lands and the time that the detention ended, for a total detention time of approximately thirty-four minutes.   Although Agent Perez did scrutinize Rynearson's passports at some point during the final portion of the detention, Agent Lands stated in a declaration that such records checks generally take a "couple of minutes."

## II.

Agents Lands and Perez argue that, on summary judgment, they can invoke qualified immunity to defeat Rynearson's *Bivens* action against them. The test for qualified immunity is a familiar one.   "First, a court must decide whether the facts . . . alleged . . . make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).   "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of [the] alleged misconduct." *Id.*   This second prong of the qualified immunity analysis asks whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates [the] right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   Stated another way, "in the light of pre-existing law the unlawfulness must be apparent." *Id.*   Qualified immunity applies unless both prongs are satisfied. *Pearson*, 555 U.S. at 232.

---

[5] The majority opinion incorrectly asserts that Agent Perez was the one who returned the passports to Rynearson and informed him that he was free to leave.  In fact, Agent Lands (not Agent Perez) was the officer who returned the passports; in his declaration, Agent Perez averred that he "informed [Agent Lands] to release Mr. Rynearson and to return Rynearson's passports and send him on his way."  ROA. 266.  In addition, the agents' voices are clearly distinguishable on the videotape, and Agent Lands is the one speaking when Rynearson receives his passports and is informed that he may leave.

No. 13-51114

The Supreme Court has made clear that while the Fourth Amendment permits routine, suspicionless stops at fixed checkpoints near the border, the scope of such stops is "quite limited." *United States v. Martinez–Fuerte*, 428 U.S. 543, 557, 562 (1976). "[A]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Id.* at 558 (internal quotation marks omitted). Moreover, this court has held that "[t]he scope of an immigration checkpoint stop is limited to the justifying, programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint." *United States v. Machuca–Barrera*, 261 F.3d 425, 433 (5th Cir. 2001). "It follows that the permissible duration of an immigration stop is the 'time reasonably necessary to determine the citizenship status of the persons stopped.'" *United States v. Portillo–Aguirre*, 311 F.3d 647, 653 (5th Cir. 2002) (quoting *Machuca–Barrera*, 261 F.3d at 433).

"An officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop." *Machuca–Barrera*, 261 F.3d at 432. "Conversely, when officers detain travelers after the legitimate justification for a stop has ended, the continued detention is unreasonable." *Portillo–Aguirre*, 311 F.3d at 654. "[A]ny further detention beyond a brief question or two or a request for documents evidencing a right to be in the United States must be based on consent or probable cause," *Portillo–Aguirre*, 311 F.3d at 652, or upon reasonable suspicion, *Machuca–Barrera*, 261 F.3d at 434. Even a three-minute extension beyond a detention's permissible duration is cognizable as a Fourth Amendment violation. *See Portillo–Aguirre*, 311 F.3d at 654.

By making Rynearson wait for thirty-four minutes, ignoring a verbal affirmation of U.S. citizenship, and rejecting multiple forms of identification, Agents Lands and Perez far exceeded the scope of the immigration-checkpoint

12

No. 13-51114

inquiry as the Supreme Court defined it in *Martinez–Fuerte*. Putting aside the dilatory nature of the stop as a whole, at a bare minimum, once Rynearson offered his passports to Agent Lands, any further detention other than the couple of minutes required to authenticate the passports was unnecessary. The State Department may issue passports only to United States citizens and non-citizen nationals. 22 U.S.C. § 212. As detailed above, Agent Lands refused to even look at the passports, and Agent Perez did not simply verify the passports' authenticity—he asked for the identity of Rynearson's commanding officer and wasted ten to fifteen minutes placing unnecessary phone calls to military law enforcement.

One cannot escape the impression that Agent Lands's refusal to look at the passports and Agent Perez's irrelevant phone calls to Rynearson's employer operated as retribution against Rynearson for asserting his rights; about three minutes into the stop, a fellow officer even pointed out the cameras in Rynearson's car. But putting that to one side,[6] after Rynearson offered his passports, Agents Lands and Perez needed only to examine them to determine whether Rynearson was a United States citizen. Therefore, Agents Lands and Perez detained Rynearson longer than "reasonably necessary to determine the citizenship status of the person[] stopped."[7] *Machuca–Barrera*, 261 F.3d at 433.

---

[6] Evidence of a defendant's subjective intentions is not relevant to the qualified-immunity defense. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817–19 (1982); *Crawford–El v. Britton*, 523 U.S. 574, 588 (1998).

[7] The length of the detention cannot be justified on the alternative basis of reasonable suspicion. At oral argument, the government correctly conceded that "this is not a *Terry* case." A drug dog did not alert when agents led it behind the car. Later, Rynearson asked Agent Lands several times whether he had reasonable suspicion to detain him; Agent Lands insisted that the detention did not require it. When Rynearson asked whether Agent Lands believed that Rynearson had violated an immigration law, Agent Lands responded, "I didn't

No. 13-51114

In addition, I would hold that at the very least, Agents Lands and Perez failed to demonstrate entitlement to qualified immunity with respect to the twenty-three minutes of detention that followed Rynearson's offer to show Agent Lands his passports.  In light of *Martinez–Fuerte*, *Machuca–Barrera*, and *Portillo–Aguirre*, and on the record as it currently stands in this case, no reasonable officer would believe that he could lawfully detain a traveler for twenty-three minutes after the traveler presents a valid U.S. passport—better evidence of United States citizenship than the state-issued forms of identification that highway travelers most frequently carry on their person.  Far more than simply ask Rynearson to give the limited information that the Supreme Court allows officers to demand at fixed border checkpoints—"a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States," *Martinez–Fuerte*, 428 U.S. at 558—Agents Lands and Perez were dissatisfied with four forms of government-issued identification and a verbal affirmation of United States citizenship.  All that remained after Rynearson's offer to surrender his passports was to authenticate them.  On the present record, no reasonable officer—in light of *Martinez–Fuerte*, *Machuca–Barrera*, and *Portillo–Aguirre*—would believe that he was entitled to take an additional twenty-three minutes while ignoring the passports and placing phone calls to Rynearson's employer.

### III.

Firm assertions of one's rights are far from "unorthodox" in a Republic that insists constitutional rights are worth insisting upon and that tasks the courts with protecting those rights.  *See, e.g.*, *Brown v. Texas*, 443 U.S. 47, 52–

---

say you violated an immigration law."  Indeed, Agent Lands insisted that he needed no articulable reason at all to detain Rynearson.

53 (1979) (holding that without reasonable suspicion, police may not require citizens to stop and identify themselves); *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983) (invalidating a stop-and-identify statute on vagueness grounds). Government officials, like the defendants in this case, often contend that "[f]ailure to conform is 'insubordination,'" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 629 (1943), but it is the courts that must draw the line "between authority and rights of the individual," *id.* at 630. In drawing this line, we do not rely upon "whether . . . we would think" complying with an official's commands "to be good, bad or merely innocuous." *Id.* at 634. "Nor does our duty to apply the Bill of Rights to assertions of official authority depend upon our possession of marked competence in the field where the invasion of rights occurs." *Id.* at 639. Rather, "we act in these matters not by authority of our competence" or by our perception of the plaintiff's actions, "but by force of our commissions." *Id.* at 640.

Agents Lands and Perez failed to demonstrate their entitlement to qualified immunity because the law is clearly established that immigration officials may not detain travelers longer than reasonably necessary to investigate their citizenship status. For the foregoing reasons, I would reverse the judgment of the district court and remand for further proceedings.