**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 14, 2011

Lyle W. Cayce
Clerk

No. 10-40556

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

ROLANDO LOPEZ,

Defendant–Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:10–CR–126–1

Before REAVLEY, GARZA, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

After a bench trial, Rolando Lopez was convicted of possessing more than 500 grams of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Lopez appeals, challenging the district court's denial of his motion to suppress evidence seized while Lopez was stopped at an immigration checkpoint. This appeal requires us to determine whether Lopez's detention was unconstitutionally prolonged beyond the time when the programmatic purpose of the immigration stop had been accomplished (i.e.,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-40556

when Lopez's immigration status was verified).  Because we find that Lopez's prolonged detention was based on a reasonable suspicion that Lopez was engaged in criminal activity, we AFFIRM.

## I

On January 24, 2010, an El Expresso passenger bus arrived at the permanent immigration checkpoint on U.S. Highway 77 near Sarita, Texas. Three U.S. Border Patrol agents boarded the bus and began an immigration inspection.  One agent proceeded immediately to the rear of the bus to check the bathroom and to begin inspecting passengers from the back, while Agent Brian Carter began inspecting passengers from the front.  The bus, which contained forty to fifty seats, was carrying roughly twenty passengers that evening, most of whom were seated towards the front.  As the inspection began, Agent Eufracio Perez remained in the front of the bus as an observer.

As Agent Carter made his way toward the middle, he noticed Lopez, age nineteen, in a window seat on the driver's side of the bus.  Lopez was seated next to a woman in her late thirties or early forties, but the two did not appear to be traveling together.  Lopez looked out the window the entire time Agent Carter questioned the woman in the aisle seat about her immigration status, which Agent Carter found unusual.[1]  When Agent Carter finished talking with the woman, Lopez turned to him and produced his birth certificate and Texas identification card before Agent Carter had addressed him.  The identification card showed an address in Brownsville, Texas.

Conversing in Spanish, Agent Carter asked Lopez whether he was a U.S. citizen. Lopez answered affirmatively. Carter then asked Lopez whether he was traveling with anyone, to which Lopez replied that he was headed to Austin.

---

[1] At the suppression hearing, Agent Carter explained that "[n]ine times out of ten," passengers in the middle of the bus focus their attention on a Border Patrol agent while the agent questions the person seated next to them.

2

Agent Carter repeated his question, and this time Lopez said that he was traveling alone.[2] Agent Carter later described Lopez as appearing "nervous" and "shifting around in his seat" during this initial questioning.

Lopez did not appear to have any personal items with him—e.g., a bag, backpack, magazines, or books—and after Agent Carter confirmed that Lopez was traveling alone, he asked Lopez whether he had any luggage on the bus. Lopez said that he did not, and that he had clothes in Austin. Agent Carter found this suspicious for two reasons. First, as he explained at the suppression hearing, Agent Carter thought it was unusual that Lopez said he was traveling without luggage and had clothes in Austin because his identification card listed a Brownsville address. Second, Carter explained that from his training and experience as a Border Patrol agent, he knew that narcotics smugglers tended to separate themselves from their luggage. And so, given Lopez's unusual body language and Carter's heightened suspicion in light of the questions and answers that just preceded, when Lopez said that he was not traveling with any luggage on the five- to eight-hour trip from Brownsville to Austin, Agent Carter "believed he was smuggling narcotics."

When Agent Carter finished this series of questions, he had no doubt about Lopez's status as a U.S. citizen. But because he now believed that Lopez was smuggling narcotics, he asked Agent Perez, who had come from his position at the front of the bus and was standing behind Agent Carter during the interview,[3] to escort Lopez off the bus for further questioning. Agent Perez

---

[2] At the suppression hearing, Agent Carter explained that this series of questioning also raised his interest. As to Lopez's seating arrangement, Agent Carter was thinking "Why is he sitting next to this woman if there . . . are open seats on the bus?" As for Lopez's non-responsive answer to the opening question about whether he was traveling alone, Agent Carter said that he began wondering, "Why didn't he answer my question correctly? It wasn't a difficult question. You know, why is he anticipating possibly my questions?"

[3] Agent Perez explained that he came to assist when Carter began questioning Lopez because he perceived Lopez to be displaying unusual behavior. *See* R. 130 ("As I was observing

asked Lopez in Spanish, "Can you get off the bus to ask you more questions?" Lopez did not say anything in response, but stood up and got off the bus. Agent Carter then resumed inspecting passengers inside the bus while Agent Perez questioned Lopez outside.

After asking several questions alongside the bus, Agent Perez noticed that Lopez's feet were "high" in his shoes and appeared to be uncomfortable. Agent Perez asked Lopez to remove his shoes, which, upon further inspection, revealed a bundle containing .93 kilograms of methamphetamine.

Lopez moved to suppress the evidence seized by Agent Perez on the ground that it was obtained in violation of the Fourth Amendment to the U.S. Constitution. Specifically, Lopez argued that Agent Carter's questioning, which ultimately led to the discovery of the methamphetamine, was unconstitutionally prolonged beyond the time when the programmatic purpose of the immigration stop had been accomplished (i.e., when Lopez's immigration status was no longer in question). The district court conducted an evidentiary hearing and denied Lopez's motion to suppress, explaining:

> I think it's very close but I think it was a very short time and I believe that when the officer testified – and I don't have any reason to doubt his credibility – and I think that your client was also creditable – that the difference in the addresses, where he said he was living in Austin but his driver's license said an address in Brownsville. He had gone for a very long trip actually to Matamoros and back to Austin without any baggage, any luggage. And the fact that he appeared to the agent to be nervous was enough to give him reasonable suspicion to make further inquiries. And it didn't last long. The whole bus stop apparently was seven minutes or less, and the conversation with your client was five minutes or less.

The district court observed that the defense had failed to elicit any evidence as to "how many times [Border Patrol agents] searched people and found nothing."

---

the people in the bus, I noticed that Mr. Lopez was kind of nervous, avoiding eye contact, just looking outside the window. And I approached Mr. Carter to see if he needed anything.").

No. 10-40556

After a short bench trial, the district court convicted Lopez of possessing more than 500 grams of methamphetamine with intent to distribute, and sentenced him to 63 months' imprisonment, among other penalties. This appeal followed.

## II

"In an appeal from the denial of a motion to suppress, we review questions of law *de novo* and the district court's factual findings for clear error." *United States v. Portillo-Aguirre*, 311 F.3d 647, 651–52 (5th Cir. 2002). "To the extent the underlying facts are undisputed, as they essentially are here, we may resolve questions such as probable cause and reasonable suspicion as questions of law." *Id.* at 652 (quoting *Blackwell v. Barton*, 34 F.3d 298, 305 (5th Cir. 1994)). We view the evidence in this case in the light most favorable to the government, as the party that prevailed below. *See United States v. Ellis*, 330 F.3d 677, 679 (5th Cir. 2003).

## III

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). The Supreme Court, however, has upheld the constitutionality of suspicionless searches at permanent immigration checkpoints like the one involved in this case. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976); *see also United States v. Moreno-Vargas*, 315 F.3d 489, 490 (5th Cir. 2002). Border Patrol agents stationed at a permanent checkpoint may stop a vehicle, question its occupants about their citizenship, and conduct a visual inspection of the vehicle without any individualized suspicion that the vehicle or its occupants are involved in a crime. *See Martinez-Fuerte*, 428 U.S. at 558–61. This rule applies

equally to commercial buses. *See Portillo-Aguirre*, 311 F.3d at 652; *United States v. Ventura*, 447 F.3d 375 (5th Cir. 2006).

Nonetheless, immigration checkpoint stops, which constitute "seizures" within the meaning of the Fourth Amendment, are not without limits. *See Martinez-Fuerte*, 428 U.S. at 556. "To determine the lawfulness of a stop, we ask whether the seizure exceeded its permissible duration. We look to the scope of the stop in order to determine its permissible duration." *United States v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir. 2001). The scope of a checkpoint stop is limited to determining the citizenship status of persons passing through the checkpoint, and the permissible duration "is therefore the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.* at 433. This includes the time needed to ascertain the number and identity of the occupants of the vehicle, to inquire about citizenship status, to request identification or other proof of citizenship, and, if necessary, to request consent to extend the detention. *Id.*

"An officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop. It is the length of the detention, not the questions asked, that makes a specific stop unreasonable . . . ." *Machuca-Barrera*, 261 F.3d at 432; *see also United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) ("[W]e reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation."). "[D]etention, not questioning, is the evil at which *Terry*'s second prong is aimed." *Shabazz*, 993 F.2d at 436.

Here, the district court found that the El Expresso bus was stopped for approximately seven minutes, and that Agents Carter and Perez questioned Lopez inside and outside the bus for "five minutes or less" combined. The parties do not contest these findings. Instead, Lopez avers that the relevant period for Fourth Amendment purposes is the three-plus minutes of questioning that

No. 10-40556

occurred outside the bus after Agent Carter was satisfied of Lopez's citizenship status. *See* Appellant's Reply Br. at 3; *see also* Oral Argument at 1:25–1:42, *available at* http://coa.circ5.dcn/OralArgRecordings/10/10-40556_4-27-2011.wma. But, as Lopez agrees, this measuring period is correct only if Agent Carter did not have reasonable suspicion to prolong the questioning. *See* Oral Argument at 2:25–2:55; *see generally Machuca-Barrera*, 261 F.3d at 434 ("[I]f the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification."). Otherwise, the relevant period for assessing the reasonableness of Lopez's detention is the one-to-two minutes between when Agent Carter began interviewing Lopez on the bus and the time that he asked Agent Perez to escort Lopez off for additional questioning. And, as we have found elsewhere, a stop lasting "only a couple of minutes" is within the permissible duration of an immigration stop. *Machuca-Barrera*, 261 F.3d at 435. Thus, this appeal turns on whether Agent Carter had reasonable suspicion to prolong the interview at the time he concluded his initial immigration questioning and asked Lopez to get off the bus.

Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968), but "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The relevant inquiry is whether the "totality of the circumstances" creates a reasonable suspicion of criminal activity. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). Viewed together, the totality of evidence here—Lopez's avoidance of Agent Carter as Carter questioned his seatmate, Lopez's non-responsive answer to Agent Carter's opening question, Lopez's statement that he had clothes in Austin while his ID showed a Brownsville address, Lopez's nervousness and shifting posture, and Lopez's indication that he was traveling without any luggage on a lengthy bus ride, which in Agent Carter's training and experience was a technique often

No. 10-40556

employed by drug smugglers—all combined to create a reasonable suspicion that Lopez was engaged in criminal activity. As such, we agree with the district court that Agent Carter was justified in extending Lopez's detention. And because Carter's reasonable suspicion was developed during the permissible duration of the routine immigration check, *see Machuca-Barrera*, 261 F.3d at 435, we affirm the district court's denial of Lopez's motion to suppress.[4]

## IV

The judgment of conviction is AFFIRMED.

---

[4] Our finding that Agent Carter had reasonable suspicion to prolong the questioning obviates the issue of consent alternatively briefed by the parties.