

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00205-CR
_____

ANNETTE SOTELO, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 186th District Court
Bexar County, Texas
Trial Court No. 2022CR2705

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

After the trial court denied her motion to suppress, Annette Sotelo entered a plea-bargain agreement and pled no contest to a reduced charge of possession of four grams or more but less than 200 grams of a controlled substance in penalty group 1. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(d) (Supp.). The trial court[1] deferred adjudication of Sotelo's guilt, placed her on deferred adjudication community service for eight years, and imposed a fine of $2,000.00, $1,500.00 of which was probated. Sotelo appeals the trial court's denial of her motion to suppress.

We reverse the trial court's decision and remand this case for further proceedings consistent with this opinion.

## I.    The Suppression Hearing

At the hearing on Sotelo's motion to suppress, San Antonio Police Department (SAPD) Detective Gregory Trevino testified that the narcotics unit received information that an individual was selling narcotics at an apartment complex in Bexar County. Trevino did not know how this information was received but explained that it may have come from "an anonymous tip," the result of "some kind of research," or the "known history of a narcotics dealer." He also did not reveal the identity of the individual, whom he referred to as a "drug dealer," because the individual was subject to an ongoing investigation. Trevino had not seen the drug dealer in person before witnessing the transaction with Sotelo. Regarding how he came

---

[1]Originally appealed to the Fourth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We follow the precedent of the Fourth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

to be at the apartment complex at the time of this incident, he explained that "[i]t was just chance." He continued, "I had been checking it out for several days and I happened to see the transaction when I saw the transaction."

Trevino testified that, on the night of the transaction, he was in the parking lot of the apartment complex in an unmarked vehicle, wearing plain clothes. He observed Sotelo pull up and stay in her vehicle, and "another individual" met her at the vehicle and handed her a "multi-colored box" that appeared to be a food box.[2] He did not see Sotelo hand anything back to the individual. Sotelo sat in her vehicle for several minutes, then left. Trevino testified that, from his training and experience as a detective, that activity was consistent with a narcotics sale.

When Sotelo left, Trevino and other detectives followed her and observed her stop in a crosswalk at the intersection of San Pedro and Basse. Trevino relayed that information to SAPD Officers Orlando Tolento and Joe Nieto, who initiated a traffic stop on Sotelo. Trevino testified that, after the stop, he stayed nearby where he could maintain visual contact. Eventually, over 400 grams of methamphetamine[3] was collected from the FoodSaver box.

Trevino acknowledged that, after officers stopped Sotelo, they took her out of her vehicle and placed her in handcuffs. He also agreed that, after she was in handcuffs, Sotelo could not reach into her vehicle.

---

[2]The box, which was ultimately found to contain a large amount of methamphetamine, was variously referred to as a food box, a food processor box, and a food saver box. The video from the patrol car's dash camera showed that the box displayed "FoodSaver" near the top of the front and side of the box, and appeared to be approximately sixteen inches tall, ten inches wide, and four inches deep. We will hereinafter refer to it as a "FoodSaver box," except in direct quotes.

[3]Trevino administered a field test that was positive for methamphetamine.

Nieto testified that, on November 10, 2021, he and Tolento were the "uniform presence for . . . a narcotics unit." He testified that, on the night of this incident, the detectives conducting surveillance observed Sotelo's vehicle in a crosswalk and make an illegal right turn, and they communicated the information to him and Tolento. After he and Tolento initiated a traffic stop, Sotelo turned into a corner store.

Nieto testified that Sotelo was the only occupant of her vehicle, and when he approached the passenger side of the vehicle, he saw the handle of a sword that was over a foot long. Because there may have been other weapons in the vehicle, Tolento removed Sotelo from the vehicle and placed her in handcuffs. Nieto did not know if Tolento got consent to search the car.

Nieto acknowledged that Sotelo was handcuffed and out of the vehicle within a minute after she was stopped and that, at that point, Sotelo was not a danger to get into the vehicle or to reach anything in it. Nieto also testified that, on the video from either his body camera or the dash camera,[4] it appeared that Tolento and Sotelo had a conversation and that consent was possibly given for Tolento to open the FoodSaver box, which was sitting on the hood of the patrol car at the time. According to Nieto, because Tolento determined there appeared to be narcotics in the FoodSaver box, at that point the car could be searched.

Initially, Tolento testified that he obtained consent to search Soleto's vehicle and that Nieto searched it. However, when asked, "[W]hat exactly did [Sotelo] say to you?" he stated:

> She originally consented to searching of the box, which I had removed from the vehicle at the time. It was sitting on her passenger seat. I asked her if she knew what was in the box, and she stated that it was a vacuum seal device for sealing food.

---

[4]It is unclear from the record which video Nieto was watching during this part of his testimony.

4

I asked her if I could look into the box and she consented for me to look in the box; at which point I discovered what appeared to be alleged narcotics in the box.

He also testified that he had a prior suspicion of what was in the FoodSaver box based on the information relayed detailing the violation for the traffic stop.

On cross-examination, Tolento again testified:

Q.     [(By Sotelo)] How did you happen to have the box in your hand?

A.     I removed the box from the passenger's seat.  It was sitting on the passenger's seat.

Q.     You said that [Sotelo] gave you permission to search the box.  Did she give you permission to search the car?

A.     Once we had searched the box and found the alleged narcotics, there was probable cause to believe there could have been further -- at which point my partner proceeded to search the vehicle to make sure there was no further contraband in the vehicle.

The videos from Nieto's body camera and from the patrol car's dash camera were also introduced into evidence.[5]  The videos showed that, after they stopped behind Sotelo's vehicle in the parking lot of the store, Tolento approached the driver's door, while Nieto approached the front passenger door.  After Sotelo exited her vehicle, she was immediately handcuffed and appeared to answer questions from both Nieto and Tolento.  Meanwhile, Nieto removed the sword from the front passenger's seat, examined it, and placed it on the front floorboard.  The FoodSaver box was also laying on the passenger seat.  Sotelo was then taken by Tolento to the front of the patrol car and was questioned by Nieto.

---

[5]Tolento did not turn on his body camera.

While Nieto talked with Sotelo,[6] Tolento returned to the open driver's door, looked in the vehicle with the assistance of his flashlight, then bent down, put his upper torso completely inside the vehicle and searched the inside of the vehicle, including under the driver's seat. Tolento walked to the open front passenger's door and again looked inside the vehicle with the assistance of his flashlight. He then bent down, put his upper torso completely inside the vehicle, and searched the interior. After he emerged from the vehicle, he reached down and appeared to examine something on the front passenger's seat. Then he returned to the patrol car and spoke with Sotelo. (Although not all of the conversation was intelligible, Tolento pointed to Sotelo's vehicle and asked, "Can I open it," and Sotelo responded, "Yes, you can open it, and the trunk? . . . Yes, you can open it." Tolento then asked another question while pointing toward the vehicle, and Sotelo responded, "Yeah, that's (unintelligible)." Tolento returned to the open front passenger's door, looked inside, again put his upper torso inside the vehicle, and searched for about forty seconds. He then walked to the driver's door, pulled the trunk release, and looked inside the trunk. Tolento returned to the front of the patrol car and had a short conversation with Sotelo regarding the sword and the FoodSaver.[7] He then returned to the open front passenger door, removed the FoodSaver box, set it on the dash of the patrol car, had a short exchange with an unseen person, picked up the FoodSaver box, flicked the top cover,[8] and looked inside the

[6]When Nieto talked with her, Sotelo told him that she had bought the FoodSaver on Facebook Marketplace for ten dollars and came to pick it up.

[7]During that conversation, Nieto muted the audio to his body camera, and it was not unmuted afterwards.

[8]The top cover was cut loose on three sides and about one-half of the fourth side.

box. After a further exchange with Sotelo, officers placed Sotelo in the backseat of the patrol car, Nieto looked inside the FoodSaver box, and then Nieto conducted his search of the vehicle.

Sotelo testified that she had four adult children and a twelve-year-old child. She was divorced from a man who had sexually assaulted her daughter for seven years and murdered a friend of hers. At the time of this traffic stop incident, her ex-husband was not in jail, and she carried knives to protect herself. Sotelo was a certified nurse's aide and worked as an administrator at a veteran's home.

She testified that, on the day of the incident, she went to her father's house after work and that her stepbrother and his family were there. Her stepbrother had a new apartment and asked her to pick up a FoodSaver that he had found on the internet for ten dollars. She agreed to do so but told her brother to have the seller meet her out front. However, when she got to the apartments, the seller instructed her to go around the apartments and park in the back. The man walked up to her car with the FoodSaver box, and she told him to just put it on the front seat. After he put the FoodSaver box on the front seat, he walked away, and she called him back to give him the ten dollars. Then she consulted a map to find the fastest way to a gas station and then to her house.

Sotelo said that she saw a group of four men in the apartment parking lot, including Trevino, hanging out and laughing. When she left the apartment parking lot, she noticed headlights behind her. She testified that she did not stop in a crosswalk and that, when the patrol

7

car engaged its emergency lights, she pulled into a gas station. When the officers came to her vehicle, they told her to get out, and they would not tell her what she had done wrong.[9]

She testified that she never gave the officers permission to search her vehicle. Tolento asked her about the sword, and she explained why she had it and told him there was another one in the middle console. He kept asking her a lot of questions and asked what else she had, which she thought was weird. Then he went and got the FoodSaver box out of the vehicle. She denied that she ever told him that he could search it or take it out of her vehicle.

Regarding her interaction with Tolento regarding the FoodSaver box, Sotelo testified,

[W]hen he asked if he could open the box, he said "Can I see what's in the box" -- well, he said, "What's in there?" And I said, "a food saver".

Then he said, "Are you sure that is what's in there?" And I said, "That is what's supposed to be in there". And I said, "I am not hundred percent sure, no, because I have not looked in the box". I was going to the gas station where there's light and people and it's not as scary[.]

And then he said "What if it's not a food saver?" And I said, "that's okay, it was only $10 that I lost."

. . . .

When the officer asked me if he could open the box and see what's in there. And my response was[,] "I don't know why you're asking me to open the box, you already took it out of my car without my permission".

Sotelo denied that she had a conversation with Tolento about the FoodSaver box before he took it out of her vehicle. She maintained that she found out there were drugs in the FoodSaver box after Tolento opened it and told her drugs were inside.

---

[9]Sotelo testified that the officers were very nice and polite and that they did not intimidate her but that they never told her what was going on.

The trial court denied the motion to suppress and orally pronounced that it found (1) that the officers had reasonable suspicion to conduct a traffic stop, (2) that there was probable cause to search Sotelo's vehicle based on Trevino's testimony, and (3) that Sotelo gave her consent to search the FoodSaver box based on Tolento's testimony.

As seen above, the evidence showed that Tolento searched Sotelo's vehicle two times and that Nieto searched the vehicle once. Construed in the light most favorable to the trial court's ruling, the evidence showed that Sotelo consented to Tolento's second search of her vehicle and that she consented to a search of the FoodSaver box. However, there was no evidence that Sotelo consented to Tolento's first search of her vehicle. In this opinion, we determine whether Tolento's initial search was reasonable under any exception to the constitutional requirement that any search or seizure be pursuant to a judicial warrant, and if not, whether the taint of the illegal initial search was dissipated by Sotelo's later consent to search her vehicle and the FoodSaver box.

## II.    Standard of Review

"We review a trial court's ruling on a motion to suppress using a bifurcated standard for an abuse of discretion." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023) (citing *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008)). When supported by the record, we will defer to a trial court's express or implied findings of fact. *Id.* (citing *Shepherd*, 273 S.W.3d at 684); *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). "We review de novo legal questions and mixed questions that do not turn on credibility and demeanor, such as facts of a case that would establish probable cause." *Espinosa*, 666 S.W.3d at 667 (citing

9

*State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000)). "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Id.* (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) (plurality op.)).

**III.     Was There Probable Cause to Search Sotelo's Vehicle and Seize the FoodSaver box?**

**A.     Applicable Law**

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Igboji v. State*, 666 S.W.3d 607, 613 (Tex. Crim. App. 2023) (alteration in original) (quoting U.S. CONST. amend. IV). "Generally, the Fourth Amendment requires that searches and seizures be accomplished pursuant to a judicial warrant issued on probable cause and particularly describing the items to be searched or seized." *Id.* (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). "A warrantless search or seizure is *per se* unreasonable under the Fourth Amendment unless it falls within a recognized exception to the warrant requirement." *Id.* (citing *Missouri v. McNeely*, 569 U.S. 141, 148 (2013)). "Because a warrantless search or seizure is *per se* unreasonable under the Fourth Amendment, once a defendant has shown that a warrantless search or seizure has occurred, the burden shifts to the State to prove that an exception to the warrant requirement applies." *Id.* (citing *State v. Garcia*, 569 S.W.3d 142, 148 (Tex. Crim. App. 2018)). In this case, it is undisputed that the search of Sotelo's vehicle and the seizure of the FoodSaver box were warrantless.

One exception to the warrant requirement is the automobile exception. *Marcopoulos v. State*, 538 S.W.3d 596, 599 (Tex. Crim. App. 2017). "The automobile exception allows for the warrantless search of an automobile 'if it is readily mobile and there is probable cause to believe that it contains contraband.'" *Id.* (quoting *Keehn v. State*, 279 S.W.3d 330, 335 (Tex. Crim. App. 2009)). In this case, Sotelo drove her vehicle immediately before she was stopped, so there is no question that it was readily mobile. *See Keehn v. State*, 279 S.W.3d 330, 336 (Tex. Crim. App. 2009) (Keehn's van, which was parked in his driveway when searched, "was readily mobile, as demonstrated by Keehn's use of it days before the search, and it was subject to regulation."). We must determine, then, whether there was probable cause for Tolento's initial search of the vehicle and seizure of the FoodSaver box.

"Probable cause exists where the facts and circumstances known to law enforcement officers are 'sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Marcopoulos*, 538 S.W.3d at 599–600 (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). "For probable cause to exist, there must be 'a "fair probability" of finding inculpatory evidence at the location being searched.'" *Id.* at 600 (quoting *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008)). "A reviewing court should measure this 'probabilit[y]' by 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (alteration in original) (quoting *Brinegar*, 338 U.S. at 175). "And it must take into account 'the totality of the circumstances' known to the officer, eschewing a 'divide-and-conquer' or 'piecemeal' approach." *Id.* (quoting *Wiede*, 214 S.W.3d at 25).

11

As the Texas Court of Criminal Appeals has noted, there are "three classes of probable cause[:] . . . probable cause to arrest, probable cause to search and probable cause to investigate." *Brown v. State*, 481 S.W.2d 106, 109–10 (Tex. Crim. App. 1972) (footnotes omitted) (citations omitted). "These three types of probable cause are not mutually exclusive." *Id.* at 110. Rather, "[f]or example, the facts supplying probable cause to arrest might also furnish probable cause to search." *Id.*; *see Marcopoulos*, 538 S.W.3d at 601. "A finding of probable cause requires 'more than bare suspicion' but 'less than . . . would justify . . . conviction.'" *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (quoting *Brinegar*, 338 U.S. at 175). Nevertheless, "[t]he inarticulate hunch, suspicion, or good faith of an . . . officer is insufficient to constitute probable cause under any of the three" classes of probable cause. *Brown*, 481 S.W.2d at 110.

**B.      Analysis**

Initially, Sotelo argues that the trial court erred in finding that the officers had probable cause to search her vehicle because there was insufficient evidence to support a belief that it contained contraband. The State points to Trevino's testimony and argues that his observation of Sotelo receiving a FoodSaver box from an individual he suspected of selling narcotics in the back of an apartment complex, and his testimony that the transaction was consistent with a narcotics sale, provided probable cause to conduct a search of Sotelo's vehicle. We disagree.

Even construed in the light most favorable to the trial court's ruling, Trevino's testimony gives little support to a finding that the officers had probable cause to believe that Sotelo's vehicle contained contraband. In summary, Trevino testified that the narcotics unit had obtained information that an individual was selling narcotics from an apartment complex. Trevino did not

12

know where the information originated, whether from an anonymous tip, some kind of research, or the known history of a drug dealer. Because he did not know the origin of the information, he offered no testimony that showed that the information was reliable. He described his presence at the apartment complex when he saw the transaction between the individual and Sotelo as "just chance" because he happened to be there at the time. Even though he had checked out the apartment complex for several days, he did not testify that he had observed any other transactions involving the individual about whom he had received the information. Regarding the transaction itself, Trevino testified that he observed the individual hand a FoodSaver box to Sotelo, but he did not see her hand anything to the individual. Trevino did not testify that he saw what was in the FoodSaver box. After a few minutes, he saw Sotelo leave the apartment complex. Finally, Trevino opined that the transaction was consistent with a narcotics sale. However, other than that conclusory statement, no testimony was offered that showed that narcotics were typically packaged in FoodSaver boxes by narcotics dealers generally, or by the individual under observation specifically.

The State maintains that the facts in this case are similar to those in *Tucker v. State*, No. 03-19-00384-CR, 2021 WL 1933960 (Tex. App.—Austin May 14, 2021, no pet.) (mem. op., not designated for publication). In *Tucker*, Vicente Saenz was incarcerated for dealing narcotics. *Id.* at *1. While in jail, Officer Williams monitored Saenz's telephone call in case he asked someone to continue selling drugs for him. Williams overheard several calls between Saenz and Tucker in which they concluded that Tucker sought Saenz's permission to contact his supplier

13

and sell drugs. *Id.* In another call, Saenz vouched for Tucker's trustworthiness. *Id.* Williams then began investigating Tucker. *Id.*

While observing Tucker's residence from an unmarked car, Williams saw Tucker and two other persons, Putney[10] and Coleman, pull into the driveway behind a gold sport-utility vehicle (SUV). *Id.* Tucker and Putney got out of the vehicle and carried multiple bags and a digital safe to the SUV and opened its rear hatch. They then opened the safe, and Tucker filled a black container with small plastic baggies from the safe. Meanwhile, Coleman acted as a lookout. *Id.*

Williams concluded that that was a drug transaction, and he called for backup from uniformed officers. *Id.* at *1. Coleman motioned to Tucker and Putney when he saw the marked police vehicle. Tucker refused consent to search the SUV, but another officer looked inside and saw a plastic container and a syringe with dried blood. In a search of the SUV, the officers found eight baggies that tested positive for methamphetamine. *Id.* at *2.

The Austin Court of Appeals cited several facts in concluding that probable cause existed to search the SUV: (1) Williams witnessed Tucker ask for and receive Saenz's permission to sell drugs for him; (2) Williams saw Putney, whom he knew was involved with narcotics, hand Tucker a safe from which several small plastic baggies were removed; (3) Williams knew from experience that drug sales are typically packaged in small plastic baggies; and (4) Coleman acted as a lookout during the transaction. *Id.* at *3.

---

[10]Williams had prior narcotics experience with Putney. *Tucker*, 2021 WL 1933960, at *3.

14

Unlike *Tucker*, in this case, Sotelo was not the subject of Trevino's investigation. Also, Trevino had no prior information that Sotelo was interested in acquiring illegal drugs. Further, although Trevino saw the individual under investigation hand Sotelo a FoodSaver box, there was no testimony that drug sales were typically packaged in such containers.

In weighing whether the evidence in this case, viewed in the light most favorable to the trial court's ruling, was sufficient to warrant a belief that there was a fair probability that Sotelo's vehicle contained contraband, we think this case lies closer to *Marcopoulos*, in which the Texas Court of Criminal Appeals found that the evidence "did not rise to the level of probable cause justifying a full-blown search," *Marcopoulos*, 538 S.W.3d at 603, than to *United States v. Salas*, in which the Fifth Circuit Court of Appeals found the evidence "just barely sufficient" to rise to the level of probable cause. *United States v. Salas*, 488 F.2d 939, 941 (5th Cir. 1974).

In *Marcopoulos*, an undercover officer, Oliver, was surveilling a Houston sports bar that had a documented history of narcotics sales. *Marcopoulos*, 538 S.W.3d at 598. He observed Marcopoulos enter the bar, leave three to five minutes later, and drive away. Oliver followed him, saw him commit a traffic violation, and then radioed for a uniformed officer to conduct a traffic stop. *Id.* Officer Villa responded, "stop[ped] his marked police car behind Marcopoulos, [and] noticed [Marcopoulos] make 'furtive gestures' around the center console of his vehicle." *Id.* Oliver also observed those gestures. Villa stopped Marcopoulos, immediately arrested him, searched his vehicle, and found a baggie of cocaine in the center console and another baggie of cocaine between the center console and the passenger seat. *Id.* at 599. A third baggie of cocaine was found when Marcopoulos's personal effects were searched. *Id.*

15

The Texas Court of Criminal Appeals upheld the denial of Marcopoulos's motion to suppress based on the automobile exception. *Id.* The Texas Court of Criminal Appeals relied on the United States Supreme Court's opinion in *Sibron v. New York*, 392 U.S. 40 (1968), "which explored reasonable searches in the drug context."[11] *Marcopoulos*, 538 S.W.3d at 600 (citing *Sibron*, 392 U.S. 40).

> According to the court,
>
> In *Sibron*, a police officer surveilled the defendant for eight hours, observing conversations between him and several other people—all of whom the officer knew to be narcotics addicts. *Sibron*, 392 U.S. at 45. The officer did not overhear the contents of these conversations; observe any transactions; or see, smell, or otherwise detect the presence of drugs. *Id.* The uniformed officer eventually approached Sibron, said, "You know what I'm after," and reached into Sibron's pocket, confiscating several envelopes of heroin. *Id.*
>
> The court ruled the search unreasonable because, *inter alia*, Sibron's observed behavior did not give rise to probable cause to conduct an arrest for a drug offense. *See id*. at 62–63. The court emphasized that, although Sibron had affiliated with known addicts, "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." *Id.* at 62. The court opined that probable cause required something more—perhaps knowledge of the contents of Sibron's conversations or the observation of a transaction. *Id.* When the officer approached Sibron, however, "[n]othing resembling probable cause existed." *Id.*

*Marcopoulos*, 538 S.W.3d at 600–01 (alterations in original) (footnotes omitted).

---

[11]Although *Sibron* involved an arrest rather than a search, and it did not address the automobile exception, the Texas Court of Criminal Appeals noted that

> the fact that Marcopoulos was searched in connection with, rather than outright arrested for, a drug offense does not lessen the requirements of probable cause. The same goes for the fact that his vehicle, rather than his person, was searched, as the automobile exception neither reduces nor eliminates the probable cause standard.

*Marcopoulos*, 538 S.W.3d at 600 (footnote omitted) (citation omitted).

The court interpreted *Sibron* to "severely limit the probative value of Marcopoulos's presence at" the sports bar. *Id.* at 601. Even though the bar was a known "hotbed of narcotics activity," the court noted that "Oliver did not witness Marcopoulos initiate a transaction; engage anyone in the pursuit of drugs; or possess any containers, cash, or other paraphernalia which would suggest that he intended to buy or had recently bought contraband." *Id.* Further, even though officers had seen Marcopoulos at the bar before, the court held that, "even assuming Marcopoulos had been seen at [the bar] 'multiple times,' this hardly leads to the conclusion that, as suggested by the State, Oliver knew Marcopoulos to be a repeat narcotics customer." *Id.* at 601–02.

Further, although the court acknowledged "the suspiciousness of Marcopoulos's unusually brief appearance within the bar," it held that "this behavior does not 'warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Id.* at 602 (quoting *Brinegar*, 338 U.S. at 175–76). As a result, the court concluded, "There remains, then, a discernible gap between the reasonable suspicion aroused by Marcopoulos's brief presence at [the bar] and the proof necessary to establish probable cause."[12] *Id.* (citing *Derichsweiler v. State*, 348 S.W.3d 906, 917 (Tex. Crim. App. 2011)). That being the case, the court held that, although "Oliver's notions about Marcopoulos . . . provid[ed] reasonable suspicion justifying a temporary investigative detention, [they] did not rise to the level of probable cause justifying a full-blown search." *Id.* at 603 (footnote omitted) (citations omitted).

_____

[12]The court went on to hold that Marcopoulos's furtive gestures did not bridge that gap. *Id.* at 602.

17

In *Salas*, federal agents began surveilling a house in San Antonio at 2:00 p.m. based on information that it was involved in narcotics distribution and that the identified occupants were expected to make a delivery of a quantity of narcotics to a named dealer from Houston. *Salas*, 488 F.2d at 940. Between 2:00 p.m. and 4:30 p.m., the agents observed several vehicles come to the house and depart. *Id.* Around 4:30 p.m., the agents received information from their informant with details of the transaction involving the Houston dealer, including the meeting place, the meeting time, a description of the dealer's car, and other information. *Id.* The meeting location was placed under surveillance, and at the stated time, a Chevrolet that left from the residence appeared at the meeting place, the Houston dealer went to the Chevrolet then returned to his car, and the vehicles left. Although officers lost the dealer's car in traffic, law enforcement eventually stopped the Chevrolet and discovered a quantity of heroin and a large sum of money. *Id.*

Around 6:00 p.m., Salas arrived at the house in a Ford, entered the house, and left about five minutes later. *Id.* Salas returned to the house in the Ford around 7:50 p.m., entered the house, and left about five minutes later. *Id.* The officers did not see him take anything into the house or leave with anything on either occasion. Between the two visits by Salas, the officers saw four other vehicles come to the house and depart. *Id.* Salas was followed after the second visit and stopped by federal officers. *Id.* at 940–41. When officers came up to the vehicle, one of them saw a paper parcel, which contained contraband, on the floor near Salas. *Id.* at 941.

The Fifth Circuit Court of Appeals held "that there was sufficient probable cause-just barely sufficient-to justify stopping the car and arresting Salas." *Id.* The court reasoned,

18

The officers were informed that the house was a center of narcotics distribution. They knew that persons leaving the house approximately three hours earlier had been participants in a sizable narcotics transaction at exactly the time, place and manner stated by their informant, and that the Chevrolet which had left the house had been the means of conveying either to or from the Houston dealer a quantity of narcotics. They had seen appellant and the Ford come to the house twice in a matter of two hours, stay briefly and depart. They had seen a number of other vehicles follow the same pattern of coming to the house, the occupants entering and remaining briefly, and then departing.

*Id.* (footnote omitted).

Unlike the officers in *Salas*, in this case, Trevino did not know the origin of the information that an individual was selling drugs out of the apartment complex or the reliability of that information. Trevino did not witness any other confirmed drug sales during his surveillance or other suspicious activity that showed that the information he received was reliable. Although he witnessed the individual hand Sotelo a FoodSaver box, he did not see Sotelo hand him anything in return. Further, there was no testimony that illicit drugs sales are typically packaged in FoodSaver boxes either generally, or specifically by the individual under surveillance.

Even assuming that Trevino was surveilling the individual because he was a known drug dealer, Trevion's suspicion that Sotelo purchased illegal drugs was based on her very brief interaction with the individual. However, without any evidence indicating that the individual was actually selling illegal drugs from the apartment complex and that this transaction involved illegal drugs, as in *Marcopoulos*, Trevino's suspicions regarding Sotelo's interaction with the individual "did not rise to the level of probable cause" for a search of her vehicle. *Marcopoulos*, 538 S.W.3d at 603.

19

**IV.     Could Sotelo's Vehicle Be Searched Incident to Her Arrest?**

Another exception to the warrant requirement is a search incident to arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Although the trial court did not make explicit findings, and the State does not argue, that Sotelo's vehicle was searched incident to her arrest, we must determine whether the record would reasonably support the trial court's ruling under this theory. *See Espinosa*, 666 S.W.3d at 667.

Under this exception, "police may search incident to arrest only the space within an arrestee's '"immediate control,"' meaning 'the area from within which [s]he might gain possession of a weapon or destructible evidence.'" *Gant*, 556 U.S. at 335 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). This "exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* at 338 (citing *United States v. Robinson*, 414 U.S. 218, 230–34 (1973)). As a result, "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent[,] and the rule does not apply." *Id.* at 339 (citing *Preston v. United States*, 376 U.S. 364, 367–68 (1964)).

In the context of an automobile search, this exception "authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 343. In other words, if the occupant has been removed from the vehicle, handcuffed, and secured away from the vehicle such that she is not within reaching distance of the vehicle, the exception will not apply. *See id.* at 344.

20

Also, the "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)). As a result, when a driver is arrested for a traffic violation, this exception would not apply in most cases because law enforcement could not reasonably expect to find evidence of the crime of arrest in the vehicle. *Id.* at 344.

In this case, Sotelo was immediately removed from her vehicle, handcuffed, and taken to the patrol car. Even though a sword was found in the front passenger's seat, Sotelo was handcuffed and removed from her vehicle at the time Tolento searched the passenger compartment of the vehicle. Thus, the record showed that Sotelo was clearly not within reaching distance of her vehicle at the time of the search. Also, because Sotelo was arrested for stopping in a crosswalk and for making an illegal right turn, Tolento could not reasonably expect to find evidence of those offenses in the passenger compartment of her vehicle.

"Because police could not reasonably have believed either that [Sotelo] could have accessed [her] car at the time of the search or that evidence of the offense for which [s]he was arrested might have been found therein," we find that the record does not reasonably support the trial court's implied finding under the search-incident-to-arrest exception. *Id.*

## V. Did Sotelo's Consent to Search Her Vehicle or the FoodSaver box Dissipate the Taint of the Unlawful Search and Seizure?

A person's voluntary consent to search is another exception to the warrant requirement. *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). In its oral ruling, the trial court found that Sotelo

21

consented to the search of the contents of the FoodSaver box.[13]  The State argues that the record supports an implied finding by the trial court that Sotelo also consented to the search of her vehicle, pointing to the footage from Nieto's body camera in which Sotelo responds to questions by Tolento and appears to consent to a search of the trunk of her vehicle, and possibly other areas of the vehicle.

However, even assuming the trial court made implied findings of fact supporting the conclusion that Sotelo consented to the search of the FoodSaver box and that she consented to the search of the trunk of her vehicle, and perhaps other areas of the vehicle, the record would not support a finding that Sotelo's consent to either search occurred before Tolento's initial search of the front passenger compartment of the vehicle.  The video from Nieto's body camera showed that the officers removed Sotelo from her vehicle, handcuffed her, and took her to the patrol car in slightly over one minute from the time they approached her vehicle.  Tolento began his initial search of the front passenger compartment about ten seconds later and concluded it a little over two minutes later.

It was only after that search that Tolento returned to the patrol car and Sotelo apparently gave her consent to search the trunk, and perhaps other parts of the vehicle.  After searching the vehicle once again, Tolento removed the FoodSaver box from the front passenger seat, took it to the patrol car, and, after a short conversation with Sotelo, looked inside the FoodSaver box.[14]

---

[13]"When there are no written findings explaining the factual basis for the trial judge's decision, we imply findings of fact that support his ruling so long as the evidence supports those implied findings."  *Meekins*, 340 S.W.3d at 460 (citing *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007)).

[14]This occurred approximately three minutes after the conclusion of Tolento's initial search.

Further, although Tolento initially testified that he obtained consent to search the vehicle, when asked by the State what exactly Sotelo said, he clarified that he only got consent to search the FoodSaver box, which he obtained after he removed it from Sotelo's vehicle. He never testified that he obtained Sotelo's consent to his initial search of the vehicle. Thus, there was no evidence to support any implied finding by the trial court that Sotelo consented to Tolento's initial search of the front passenger compartment of her vehicle.

Because Tolento's initial search was warrantless, and no exception to the warrant requirement applied to the search, the initial search was unreasonable. When law enforcement conducts a search or seizure in violation of the Fourth Amendment, the "exclusionary rule exclusively serves a function of deterrence, to discourage undue police encroachment upon the privacy and personal integrity of the citizenry." *State v. Mazuca*, 375 S.W.3d 294, 300 (Tex. Crim. App. 2012) (citing *Mapp v. Ohio*, 367 U.S. 643, 656 (1961)). The exclusionary rule "often requires trial courts to exclude unlawfully seized evidence in a criminal trial" and "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called '"fruit of the poisonous tree,"'" *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

However, there are several exceptions to the exclusionary rule. *Id.* at 238. One exception is the "attenuation doctrine," which provides,

> Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."

23

*Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). Under the attenuation doctrine, "[f]actors to be considered in determining whether evidence must be suppressed include '[t]he temporal proximity of the arrest and [obtaining of the evidence], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" *State v. Jackson*, 464 S.W.3d 724, 729 n.9 (Tex. Crim. App. 2015) (second and third alterations in original) (quoting *Mazuca*, 375 S.W.3d at 302); *see also Strieff*, 579 U.S. at 239–41 (discussing these same factors under the attenuation doctrine). Further, the Texas Court of Criminal Appeals has explained "that either the first factor ('temporal proximity') or the third factor ('purpose and flagrancy') will take on greater significance in any given case, depending on whether the second factor (any 'intervening circumstances') is present."[15] *Massey v. State*, 667 S.W.3d 784, 789 (Tex. Crim. App. 2023) (citing *Jackson*, 464 S.W.3d at 732 (quoting *Mazuca*, 375 S.W.3d at 306−07)).

When, as here, the evidence was obtained as a result of a person's consent to search following an illegal search or seizure, the consent "may sufficiently dissipate the taint of the illegal [search or] seizure to permit the admission of evidence resulting from the consensual search." *Pineda v. State*, 444 S.W.3d 136, 144 (Tex. App.—San Antonio 2014, pet. ref'd) (citing *United States v. Portillo-Aguirre*, 311 F.3d 647, 658 (5th Cir. 2002)). "To show valid consent dissipating the initial illegality, the State must prove: 1) the consent was given

---

[15]For instance, in *Mazuca*, the Texas Court of Criminal Appeals recognized "the discovery of an outstanding arrest warrant in between," *Mazuca*, 375 S.W.3d at 306, an illegal stop and the seizure of physical evidence as an intervening circumstance that causes the third factor (the purpose and flagrancy of the initial misconduct) to "become[] of vital importance," *id.* at 307. *See also Massey*, 667 S.W.3d at 793 (finding that "Appellant's resistance to the *Terry* search was a new offense that constituted an intervening circumstance, shifting the proper emphasis onto the third . . . factor").

voluntarily, and 2) the consent was an independent act of free will." *Id.* (citing *Portillo-Aguirre*, 311 F.3d at 658). "Voluntariness focuses on coercion, and the second prong considers the causal connection between the 'consent' and the prior constitutional violation." *Id.* (quoting *Portillo-Aguirre*, 311 F.3d at 658).

"To determine whether [the] consent was an independent act of free will [after the initial illegality], we consider (1) the temporal proximity of the illegal [police conduct] and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *Id.* (citing *Portillo-Aguirre*, 311 F.3d at 659).

In this case, Sotelo's consent to search the trunk and her consent to search the box both occurred within five minutes of Tolento's illegal initial search and the seizure of the FoodSaver box. The United States Supreme Court in *Strieff* noted that its "precedents have declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 579 U.S. at 239 (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam)); *see Brown v. Illinois*, 422 U.S. 590, 604 (1975) (finding that a confession made less than two hours after an illegal arrest favored suppression). Because Sotelo's consent was given shortly after Tolento's illegal search, we find this factor weighs in favor of suppression. *See Pineda*, 444 S.W.3d at 144.

The second factor also favors suppression. The record does not show any intervening circumstances that could lessen the taint of the illegal search. Rather, Sotelo remained handcuffed and in police custody the entire time. *See id.*; *Kaupp v. Texas*, 538 U.S. 626, 633

25

(2003) (per curiam) (confession obtained ten or fifteen minutes into interrogation while defendant remained in custody of police after illegal arrest favored suppression of confession).

When, as in this case, there are no intervening circumstances, "temporal proximity is the paramount factor." *Mazuca*, 375 S.W.3d at 306. As a result, in the absence of intervening circumstances, "[w]hen police find and seize physical evidence shortly after [illegal police conduct], . . . that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights." *Id.* Therefore, even if Tolento's misconduct in this case was not highly purposeful or flagrantly abusive of Sotelo's Fourth Amendment rights, we find that Sotelo's consent to search the trunk of her vehicle and the FoodSaver box did not dissipate the taint of Tolento's illegal initial search and seizure "because [Sotelo's] consent was not an independent act of her free will." *Pineda*, 444 S.W.3d at 144; *see McKinney v. State*, 444 S.W.3d 128, 136 (Tex. App.—San Antonio 2014, pet. ref'd).

Because no exception to the warrant requirement justified Tolento's initial search and the seizure of the FoodSaver box, and because Sotelo's consent to search shortly after the illegal initial search and seizure did not dissipate the taint of the illegal police conduct, we find that the trial court abused its discretion when it denied Sotelo's motion to suppress.

Since "the trial court committed constitutional error by denying [Sotelo]'s motion to suppress, we must reverse her conviction unless we determine beyond a reasonable doubt that the error did not contribute to her conviction." *Pineda*, 444 S.W.3d at 144 (citing TEX. R. APP. P. 44.2(a)). In this case, the trial court's denial of the motion to suppress "undoubtedly contributed

26

in some measure to the State's leverage in the plea[-]bargaining process and may well have contributed to [Sotelo's] decision to relinquish [her] constitutional rights of trial and confrontation in exchange for a favorable punishment recommendation." *Id.* (third alteration in original) (quoting *Castleberry v. State*, 100 S.W.3d 400, 404 (Tex. App.—San Antonio 2002, no pet.)). As a result, we find that the trial court's error was harmful.

## VI.     Disposition

Because the trial court's denial of Sotelo's motion to suppress was harmful error, we reverse the trial court's judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

Charles van Cleef
Justice

Date Submitted:     August 1, 2024
Date Decided:       September 10, 2024

Do Not Publish

27